1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBBINS GELLER RUDMAN
 & DOWD LLP
DAVID T. WISSBROECKER (243867)
EDWARD M. GERGOSIAN (105679)
PHONG L. TRAN (204961)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dwissbroecker@rgrdlaw.com
egergosian@rgrdlaw.com
ptran@rgrdlaw.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY BADOLATO and BRAD MOUW, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> ENTROPIC COMMUNICATIONS, INC., MAXLINEAR, INC., EXCALIBUR ACQUISITION CORPORATION, EXCALIBUR SUBSIDIARY, LLC, UMESH PADVAL, TED TEWKSBURY, WILLIAM G. BOCK, KENNETH A. MERCHANT, KEITH E. BECHARD, ROBERT L. BAILEY, <br><br> Defendants. | Case No. 3:15-cv-00426-BAS-KSC <br><br> <u>CLASS ACTION</u> <br><br> AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY <br><br> JUDGE:  Hon. Cynthia Bashant <br> Complaint Filed:  February 25, 2015 <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

1015556_1

**INTRODUCTION**

1.      This is a stockholder class action brought on behalf of the holders of Entropic Communications, Inc. ("Entropic" or the "Company") common stock against Entropic, the members of Entropic's Board of Directors (the "Board"), MaxLinear, Inc., Excalibur Acquisition Corporation ("Merger Sub One"), and Excalibur Subsidiary, LLC ("Merger Sub Two" and with MaxLinear, Inc. and Merger Sub One, "MaxLinear") for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty in connection with the proposed sale of the Company to MaxLinear, pursuant to an unfair process and for an unfair price (the "Proposed Acquisition"), and for violations of the federal securities laws arising out of defendants' dissemination of a false and misleading registration statement in violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 14a-9 promulgated thereunder.

2.      Entropic is a world leader in semiconductor solutions for the connected home.  On February 3, 2015, Entropic and MaxLinear announced that they had entered into a definitive merger agreement (the "Merger Agreement") under which Entropic would be acquired by MaxLinear.  Under the terms of the Merger Agreement, MaxLinear will acquire the Company in a cash and stock transaction in which the Company's stockholders will receive just $1.20 per share in cash and 0.2200 of a share of MaxLinear, Inc. common stock for each Entropic common share outstanding (the "Merger Consideration").  Based on the closing price of MaxLinear, Inc. common stock on the day before the deal was announced, the Merger Consideration was only ***$3.01 per Entropic share***.

3.      The Proposed Acquisition was the result of a hopelessly flawed and self-serving sales process that was designed to ensure the sale of Entropic to one buyer, and one buyer only – MaxLinear – on terms preferential to MaxLinear.  Early in the process, MaxLinear admitted it would only be offering a "***small premium***" to Entropic's trading price as part of any deal. Nevertheless, Entropic's Board focused its

1  attention on negotiating exclusively with MaxLinear and actively took steps to shut
2  out at least one interested bidder from the process.

3      4.    In fact, one interested party, known as "Company A," submitted *two*
4  written proposals to acquire Entropic, both of which offered all-cash consideration that
5  was worth considerably more than what MaxLinear was offering.  Notably, Company A
6  submitted its initial acquisition proposal to the Board *more than three weeks* before
7  MaxLinear had even indicated an acquisition price.  And, for its second proposal,
8  Company A offered to acquire Entropic at an implied price range of *$3.33 to $3.66 per*
9  *share*, the high-end of which was *$0.65 more* than the per share consideration offered
10 by MaxLinear under the Merger Agreement.  Even the low-end of Company A's
11 proposal was significantly higher than MaxLinear's final per share price.

12     5.    Yet, despite Company A's serious interest in Entropic and the superior
13 premium Company A was willing to pay, the Board did everything within its power to
14 tilt the process in favor of MaxLinear and secure its preferred partner against the
15 threat of a competing bid.  For instance, while the Board readily provided access to
16 Entropic's data room and gave confidential financial information to MaxLinear, the
17 Board inexplicably rejected Company A's requests for the same information.
18 Furthermore, the Board demanded that Company A agree to a number of stringent
19 requirements as a precondition to continuing the buyout discussions with Entropic.
20 When Company A responded that it needed additional time to consider these
21 demands, the Board abruptly terminated all discussions with Company A and
22 immediately entered into an exclusivity agreement with MaxLinear.

23     6.    The Board further circumvented Company A's efforts by requiring
24 Company A to enter into a "standstill" agreement that prevented it from pursuing an
25 acquisition of Entropic, outside of the formal sales process dictated by the Board.
26 And, to make matters worse, the Board later inserted an "anti-waiver" provision in the
27 Merger Agreement, which specifically prohibits Entropic from waiving the provisions
28 of any confidentiality or standstill agreement, including the one executed by

Company A.  Therefore, even after the Board agreed to the Proposed Acquisition with MaxLinear, the standstill agreements continue to persist to this day and serve to bar any subsequent competing proposals by Company A, or by any other party subject to such agreements.

7.     Finally, in order to expedite the deal and lock in the Proposed Acquisition at the inadequate proposed consideration, the Board implemented a number of preclusive deal protection devices in the Merger Agreement.  Among these onerous "lock-ups," the Board agreed to a "No-Solicitation" provision that prevents Entropic from soliciting competing offers from, or even providing non-public information to, any other potential acquirers willing to pay more to acquire the Company.  There is also a "Matching Rights" provision that allows MaxLinear to match any competing superior proposal.  And, while the No-Solicitation provision makes it next to impossible for another party to pursue an acquisition of the Company, the Board also agreed to pay MaxLinear a fee of $11,650,000 in the event the Merger Agreement is terminated, thereby further minimizing any possibility of a competing bid.  Together, these lock-ups, along with the standstill and anti-waiver provisions, effectively ensure that Entropic's public stockholders will be forced into the Proposed Acquisition at an unfair price that grossly undervalues the Company.

8.     Defendants' fiduciary violations do not end there.  In order to secure shareholder approval of the flawed and unfair deal, defendants filed a materially false and misleading Form S-4 Registration Statement (the "S-4") with the United States Securities and Exchange Commission ("SEC") on March 12, 2015, which was subsequently amended on March 25, 2015.  The S-4, which recommended that Entropic shareholders vote in favor of the Proposed Acquisition, omitted and/or misrepresented material information in contravention of §§14(a) and 20(a) of the 1934 Act.  Specifically, the S-4 contains materially misleading statements or otherwise fails to provide material information about Proposed Acquisition, including, among other things: (i) the flawed and unfair sales process undertaken by the Board; (ii) the

conflicts of interests that burdened the process; (iii) the data and key inputs underlying the financial analyses performed by Barclays Capital, Inc. ("Barclays"), Entropic's financial advisor, in connection with the Proposed Acquisition; and (iv) certain financial projections prepared by Entropic's management and relied upon by Barclays in rendering its opinion as to the fairness of the Proposed Acquisition to the Company's public shareholders. By misrepresenting, or otherwise failing to disclose this material information, defendants obfuscated the unfair Merger Consideration offered pursuant to the Proposed Acquisition and the actual intrinsic value of the Company.

9. As explained herein, the foregoing information is material to the impending decision of Entropic's shareholders whether or not to vote in favor of the Proposed Acquisition and/or whether to seek appraisal for their shares. Indeed, defendants are moving quickly towards a shareholder vote, which has been set for April 30, 2015. As such, defendants' violations of §§14(a) and 20(a) of the 1934 Act and their breaches of fiduciary duty under state law to maximize shareholder value and disclose all material information in connection with a merger transaction threaten shareholders with irreparable harm for which money damages are not an adequate alternate remedy. Thus, plaintiffs seek injunctive relief to ensure that defendants cure their breaches of fiduciary duty and violations of §§14(a) and 20(a) of the 1934 Act before Entropic shareholders are asked to vote on the Proposed Acquisition and/or seek appraisal, and that defendants are not permitted to seek shareholder support of the Proposed Acquisition without complying with their duty under state law to maximize shareholder value and the federal securities laws and state law to provide shareholders with all material information.

## JURISDICTION AND VENUE

10. Pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, this Court has jurisdiction over the claims arising under and pursuant to §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

11.     This Court also has jurisdiction over all claims asserted herein, pursuant to 28 U.S.C. §1332.  Complete diversity exists here because plaintiff Brad Mouw is a citizen of Wisconsin, and plaintiff Anthony Badolato is a citizen of New York, while none of the defendants are citizens of either Wisconsin or New York.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over the claims arising under and pursuant to state law.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391 and §27 of the 1934 Act because defendant Entropic's headquarters are located at 6350 Sequence Drive, San Diego, California  92112, certain of the defendants reside in this District and defendants' wrongful acts occurred in this District.  Most of the evidence exists in this District and the harm caused by defendants emanated from and had effects in this District.  Moreover, as current (and/or former) Company officers and/or directors, each Individual Defendant has (or had) extensive contacts with this District.

**PARTIES**

13.     Plaintiff Anthony Badolato ("Badolato") is, and at all times relevant hereto was, a shareholder of Entropic.  Badolato is a resident and citizen of the State of New York.

14.     Plaintiff Brad Mouw ("Mouw") is, and at all times relevant hereto was, a shareholder of Entropic.  Mouw is a resident and citizen of the State of Wisconsin.

15.     Defendant Entropic is a corporation organized and existing under the laws of the State of Delaware.  Entropic is a citizen of the State of California, and it maintains its principal corporate offices at 6359 Sequence Drive, San Diego, California 92121.

16.     Defendant MaxLinear, Inc., is a corporation organized and existing under the laws of the State of Delaware.  MaxLinear is a citizen of California, as it maintains its principal corporate offices at 5966 La Place Court #100, Carlsbad, California 92008.

17.     Defendant Excalibur Acquisition Corporation ("Merger Sub One") is a citizen of Delaware, as it is a Delaware corporation that was formed and wholly-owned by MaxLinear, Inc., for the purpose of owning Entropic after the close of the Proposed Acquisition.

18.     Defendant Excalibur Subsidiary, LLC ("Merger Sub Two") is a citizen of Delaware, as it is a Delaware limited liability company that was formed and wholly-owned by MaxLinear, Inc., for the purpose of owning Entropic after the close of the Proposed Acquisition.

19.     Defendant Umesh Padval is and at all times relevant hereto has been a member and Chairman of the Board.  Defendant Padval also currently serves as a member of the board of directors of Integrated Device Technology ("IDT"). Defendant Padval is a resident of the State of California.

20.     Defendant Ted Tewksbury is and at all times relevant hereto has been Entropic's Interim President and CEO, and a member of the Board.  Defendant Tewksbury was formerly the President and CEO of IDT.  Defendant Tewksbury is a resident of the State of California.

21.     Defendant William G. Bock is and at all times relevant hereto has been a member of the Board.  Defendant Bock is a resident of the State of Texas.

22.     Defendant Kenneth A. Merchant is and at all times relevant hereto has been a member of the Board.  Defendant Merchant is a resident of the State of California.

23.     Defendant Keith E. Bechard is and at all times relevant hereto has been a member of the Board.  Defendant Bechard is a resident of the State of Colorado.

24.     Defendant Robert L. Bailey is and at all times relevant hereto has been a member of the Board.  Defendant Bailey is a resident of the State of Washington.

25.     The defendants named above in ¶¶19-24 are sometimes collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

26.    Plaintiffs' claims are brought as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all public holders of Entropic common stock who suffered harm as a result of defendants' misconduct (the "Class").  Excluded from the Class are the defendants named herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

27.    Plaintiffs' claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

28.    The Class is so numerous that joinder of all members is impracticable. According to the S-4, there was more than 90 million outstanding shares of common stock of Entropic, as of October 31, 2014.

29.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include, but are not limited to, whether:

(a)    defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing and disseminating a false and misleading S-4;

(b)    the Individual Defendants breached their fiduciary duties in connection with the Proposed Acquisition;

(c)    the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiffs and the other members of the Class in connection with the Proposed Acquisition;

(d)    the Proposed Acquisition was unfair because it was entered into via an unfair process and at an unfair price;

(e)    the Individual Defendants engaged in self-dealing in connection with the Proposed Acquisition;

(f)     the Individual Defendants, in bad faith and for improper motives, impeded, erected and/or retained barriers to discourage other offers for the Company or its assets; and

(g)     plaintiffs and the other members of the Class have been damaged as a result of the conduct detailed herein.

30.     Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

31.     Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

32.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

33.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

34.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE PROPOSED ACQUISITION

**Entropic Seeks to Be Acquired by MaxLinear**

35.     Based in San Diego, California, Entropic is a world leader in semiconductor solutions for digital entertainment systems.  The Company specializes in products and solutions for the delivery, connectivity and consumption of high definition (HD) video, standard definition (SD) video and other multimedia content for the connected home.  Prior to the Proposed Acquisition, Entropic had two primary product lines: (i) Set-Top Box System-on-a-Chip ("STB SoC") components used to

1   receive and process external television signals; and (ii) "Connectivity" solutions used

2   to enable access to broadcast and Internet Protocol television (IPTV) services, as well

3   to deliver other media content, such as movies, music and games throughout the

4   home.  Entropic's most important Connectivity product is its MoCA (Multimedia over

5   Coax Alliance) technology, an industry standard chipset used to convert previously

6   installed coaxial cable into a robust, high-speed entertainment network.

7        36.     In response to the sweeping transition by consumers away from

8   traditional broadcast and cable television viewing to newer digital, multimedia

9   formats (*i.e.*, HD television, cell phones and tablets), Entropic, in 2013, shifted its

10  internal organizational structure from a product-driven company into a global

11  solutions and segment-driven organization focused on serving its original

12  equipment/device manufacturers and Pay-TV service provider customers.  Entropic

13  adopted a new corporate mission: to power the whole home entertainment experience

14  by transforming the way entertainment is delivered, connected and consumed in the

15  home.  In an effort to achieve its goal of becoming a total set-top box provider,

16  Entropic made a number of key corporate acquisitions, including its $65 million

17  acquisition of Trident Microsystems and its $13 million acquisition of Mobius

18  Semiconductor.  Through these acquisitions and its own development efforts, Entropic

19  amassed an extensive and valuable portfolio of more than 1,500 technology patents.

20       37.     As 2013 proved to be a transitional year, Entropic sought to re-position

21  itself for sustained, long-term growth in 2014.  During a February 5, 2014 conference

22  call to discuss Entropic's fourth quarter 2013 earnings, then-President and CEO

23  Patrick Henry reported that the Company's significant investment in product

24  development was finally paying off and would spur revenue growth toward the latter

25  half of 2014 and beyond: "***We do, however, continue to win designs at major service***

26  ***providers that we expect will launch in the second half of this year***.  Although we're

27  not able to discuss specific details of these design wins yet, ***we do expect they will***

28  ***contribute materially to revenue in the second half of 2014 and into 2015***."  Henry

1    also confirmed that the Company was poised to successfully execute its business plan

2    and enhance long-term shareholder value: "We have, however used 2013 to develop

3    relevant and competitive products. And we believe the pipeline of design wins are in

4    place to drive long-term growth. We remain keenly focused on the successful

5    execution of our plan to grow the Company and enhance shareholder value."

6    38.    Accordingly, in the months leading up to the Merger Agreement,

7    Entropic appeared to be well positioned to achieve sustained, long-term profitability

8    as a stand-alone company.  However, despite the Company's bright financial outlook

9    and management's representation that they were committed to pursuing the

10   Company's current business plan, the Board abruptly reversed course and authorized a

11   review of the Company's strategic alternatives in early August 2014.

12   39.    This led to a meeting between representatives of Entropic and MaxLinear

13   on August 6, 2014 about a potential business combination between the two

14   companies.  The management of the two companies were very familiar with one

15   another and were inclined to do a deal together.  Like Entropic, MaxLinear was

16   headquartered in San Diego, and it too was a provider of semiconductor technology.

17   And, this was not the first time that a potential combination between Entropic and

18   MaxLinear had been raised –management of the two companies had intermittent

19   discussions concerning a strategic combination going back several years, as far back

20   as MaxLinear's initial public offering in 2010.

21   40.    Moreover, members of the respective boards of the two companies had

22   longstanding ties with each other.  Defendant Ted Tewksbury, an Entropic Board

23   member who would later become the Company's interim President and CEO and

24   Board member before the announcement of the Proposed Acquisition, was formerly

25   the President and CEO of another semiconductor company, IDT.  Defendant Umesh

26   Padval, Entropic's current Chairman of the Board, is also affiliated with IDT and still

27   serves on IDT's board.  Furthermore, MaxLinear board member Donald Schrock is

28   affiliated with IDT and serves on that company's board with Padval.  Notwithstanding

1  their conflicted relationship, Tewksbury, Padval and Schrock would play active roles
2  in the sales process and communicated with each other during that time.  In fact, the
3  Board made no apparent effort to evaluate Tewksbury, Padval and Schrock's ties and
4  did not consider whether a conflict existed.

5       41.    Spurred by the discussions between the two companies, Entropic's Board
6  updated the charter of the Strategic Committee on August 15, 2014, and authorized
7  the Strategic Committee to oversee and direct management's review of strategic
8  alternatives and its evaluation of any proposals for the Company.  Notably, the three-
9  person Strategic Committee included defendants Padval and Tewksbury, who again
10 had a longstanding business relationship with MaxLinear board member Schrock.

11      42.    By early September 2014, however, Schrock confirmed to defendant
12 Padval that MaxLinear would be not submitting an offer for Entropic at that time.
13 Schrock explained that MaxLinear would only be interested in pursuing an acquisition
14 if Entropic considered eliminating certain product lines, including the Company's
15 STB SoC products.

16      43.    Despite this news, the Board remained fully committed to pursuing a sale
17 of the Company.   On September 16, 2014, Entropic's management publicly
18 announced that the Company was initiating a strategic review process and that it had
19 retained Barclays as its financial advisor in connection with those efforts.

20      44.    While representatives of Entropic and MaxLinear continued to meet
21 around this time, MaxLinear's management once again reiterated on October 9, 2014
22 that it would not pursue an acquisition unless Entropic agreed to exit or restructure its
23 STB SoC business.  A few weeks later, on October 28, 2014, the Board acquiesced to
24 MaxLinear's demands and agreed to discontinue the Company's STB SoC product lines
25 and directed management to prepare a restructuring plan to implement this strategy.

26      45.    That same day, on October 28, Entropic was contacted by Company A, a
27 financial investor in China, regarding a possible acquisition.  The Board required
28 Company A to execute a confidentiality agreement, which contained a strict twelve-

1    month standstill provision that effectively barred Company A from pursuing an

2    acquisition of Entropic, outside of the formal sales process dictated by the Board.

3          46.    On November 10, 2014, Entropic announced a restructuring strategy to

4    refocus on its core connectivity business, while discontinuing its STB SoC product

5    lines, consistent with MaxLinear's demands.  As part of this restructuring strategy, the

6    Board authorized the termination of Henry as CEO and the appointment of defendant

7    Tewksbury as interim CEO of the Company.  The Board also replaced the Strategic

8    Committee with an Executive Committee, comprised of defendants Padval, Robert

9    Bailey, and William Bock, which was vested with the same authority to direct the

10   strategic review of the Company.  Thereafter, Tewksbury and Padval continued to

11   play active roles in the sales process and the discussions with MaxLinear, despite their

12   conflicted relationship with Schrock.

13         47.    On November 28, 2014, Company A submitted a written indication of

14   interest to acquire Entropic for an all cash price in the range of 120% to 150% of the

15   mean market capitalization of Entropic for the 20 trading days prior to the signing of

16   the letter of intent.  Notably, the S-4 does not disclose the per share value of

17   Company A's initial proposal; however, based on the 20-day mean market

18   capitalization and share price range of Entropic during that time, Company A's

19   proposal represented an implied price range of ***$3.02 to $3.77 per Entropic share***.

20   MaxLinear, on the other hand, still had not made any offer for Entropic at that point.

21         48.    On December 1, 2014, defendant Padval was advised by a MaxLinear

22   director that while MaxLinear was still open to making a proposal to acquire Entropic,

23   any consideration offered by MaxLinear would reflect just a "***small premium***" to

24   Entropic's trading price.  Despite MaxLinear's acknowledgement that it was only

25   willing to acquire Entropic at a marginal premium, the Company's Board and

26   management continued to be laser-focused on pursuing a deal with MaxLinear, and

27   MaxLinear only.

28

49. Representatives of Entropic and MaxLinear continued to hold meetings concerning a potential acquisition through January 2015, including high-level discussions between Tewksbury and MaxLinear's CEO. During this time, representatives of Entropic addressed financial diligence concerns that had been raised by MaxLinear. Company A, on the other hand, was all but ignored and was not provided any financial diligence during this time.

50. On January 10, 2015, MaxLinear submitted a proposal to acquire Entropic in a cash and stock transaction by which Entropic's shareholders would receive just $1.20 per share in cash and 0.2200 shares of MaxLinear Class A common stock for each share of Entropic common stock. The total consideration proposed by MaxLinear was valued at approximately *$2.96 per Entropic share* at the time. Despite the fact that MaxLinear's mixed consideration proposal was worth *less* than Company A's all-cash proposal, the Board still considered MaxLinear to be its "primary option" and took active steps to secure its favored partner against the threat of any further bid by Company A.

51. Specifically, on January 11, 2015, the Board directed Entropic management to suspend discussions with Company A and enter into an exclusivity agreement with MaxLinear, if Company A did not "significantly" improve its offer "within a short period of time." The Board's decision made little sense and was totally one-sided, considering that: (i) the Board had previously failed to act with any urgency with Company A and was now threatening to cut off discussions, unless Company A acted quickly and submitted another offer; and (ii) Company A's all-cash offer was already "significantly" better than MaxLinear's January 10 proposal, yet the Board was seeking to go exclusive with MaxLinear.

52. Despite having no access to any financial diligence, and no real access to Entropic's senior management, Company A, on January 12, 2015, submitted a revised offer to acquire Entropic at a price range between *$300 million and $330 million* of the Company's equity value, again in all-cash, fully-financed transaction. The S-4

1    once again failed to disclose the value of Company A's second proposal on a per share

2    basis, but based Entropic's share price and number of shares outstanding at the time,

3    Company A's proposal represented an implied price range of ***$3.33 to $3.66 per***

4    ***share.***  Therefore, Company A had significantly increased the low end of its previous

5    proposal by approximately $0.30 per share.  Although Company A had now submitted

6    two proposals that were considerably higher in value than MaxLinear's January 10

7    proposal, the Board continued to focus its exclusive attention on MaxLinear and

8    sought only to do a deal with that company.

9        53.     To that end, the Board continued to impose unfair and onerous demands

10    on Company A in an effort to thwart its pursuit of Entropic.  On January 17, 2015, the

11    Board required Company A to submit yet another revised offer, this time demanding

12    that Company specify a single offer price rather than a range.  Company A responded

13    that any final price would depend on the results of its due diligence, which the Board

14    had consistently refused to provide to Company A.  In stark contrast, however, the

15    Board had already provided complete access to Entropic's data room to MaxLinear by

16    that time, so that MaxLinear could complete its due diligence.

17        54.     A few days later, on January 19, 2015, the Board decided to move the

18    goalpost once again – this time by requiring Company A to agree to certain terms

19    within the "next 24-36 hours" as a prerequisite to continuing discussions with

20    Entropic.  The Board made the following demands on Company A: (i) payment of a

21    cash purchase price of $4.00 per share of Entropic common stock; (ii) the signing of a

22    definitive agreement before February 19, 2015; (iii) no exclusivity period; and (iv) the

23    payment of a reverse break-up of $50 million fee, to be immediately deposited with an

24    escrow agent, which would be disbursed to Entropic if the transaction was terminated

25    due to Company A's inability to secure the necessary foreign investment approval.

26    There was simply no way that Company A could meaningfully evaluate these terms,

27    much less agree to them, within the mandated 24-36 hour period, particularly when it

28    had been denied the opportunity to conduct due diligence.

55.   To no surprise, Company A responded the next day and advised Entropic's financial advisor, Barclays, that it needed additional time and could not commit to the timeline mandated by the Board.  Barclays immediately indicated that Entropic would be suspending its discussions with Company A and would focus on negotiating a merger agreement with another party.  Importantly, because the Board had previously required Company A to sign a confidentiality agreement with a twelve-month standstill provision, Company A was effectively barred from submitting another offer or otherwise pursuing an acquisition of Entropic, after discussions between the parties ceased.  Moreover, the Board would later authorize the use of an "anti-waiver" provision in the Merger Agreement with MaxLinear, which prohibited Entropic from waiving the provisions of any previously-executed standstill agreements, therefore further barring Company A and other parties from submitting a potentially superior acquisition proposal, even after the deal was announced.

56.   Once Company A was removed as a competitive threat, the Board authorized Entropic to enter into an exclusivity agreement with MaxLinear on January 21, 2015.  Thereafter, representatives of Entropic and MaxLinear rushed to negotiate the Merger Agreement and related documents.  However, there was no effort by the Board to extract additional consideration from MaxLinear over and above what was offered in its January 10 proposal, despite the fact that the value of its proposal was considerably less than what Company A had offered.

57.   By February 3, 2015, the terms of the Merger Agreement were finalized, which included, among other things, a No-Solicitation provision, a Matching Rights provision, the anti-waiver provision and a $11.65 million termination fee.  Notably, the Board did not include a collar provision in the Merger Agreement that would serve to protect the Company's public shareholders in the event the market price of MaxLinear's common stock drops prior to the closing.

58.   That same day, Barclays delivered its opinion to the Board that the merger consideration offered under the Merger Agreement was fair from a financial

point of view.  But as discussed below, Barclays' "fairness" opinion and its supporting financial analyses were based on erroneous financial projections, which threw off Barclays' calculations of MaxLinear's projected cash flows and rendered them incorrect.  Despite Barclays' flawed fairness analysis, the Board unanimously approved of the Merger Agreement and continued to endorse it, even after the errors and accuracies were revealed.

59.     After the close of trading on February 3, Entropic and MaxLinear issued a joint press release announcing the execution of the Merger Agreement, which states in pertinent part:

**MaxLinear to Acquire Entropic, Reaffirms Its**
**Fourth Quarter 2014 Guidance and Provides**
**Outlook for First Quarter 2015**

*Acquisition Expands MaxLinear's Strategic Presence in Broadband*
*Access and Connectivity Markets*

*Acquisition Expected to be Immediately Accretive to*
*Non-GAAP Earnings; Targeting Greater than $20 Million*
*in Cost Savings in First Full Calendar Year Post-Close*

. . . MaxLinear, Inc. (or "MaxLinear"), a leading provider of integrated radio frequency ("RF") and mixed-signal integrated circuits ("ICs"), and Entropic Communications, Inc. (or "Entropic"), a world leader in semiconductor solutions for the connected home, today announced that they have signed a definitive agreement for MaxLinear to acquire Entropic. The boards of directors of both MaxLinear and Entropic have unanimously approved the transaction.

Entropic shareholders will receive (i) $1.20 per share in cash and (ii) 0.2200 shares of MaxLinear common stock for each Entropic common share outstanding. Based on MaxLinear's closing stock price on February 2, 2015, the merger consideration is valued at approximately $3.01 per Entropic share. The implied total transaction value is approximately $287 million and the implied enterprise value is $181 million, net of Entropic's cash balance as of December 31, 2014. Shareholders of MaxLinear and Entropic will own approximately 65% and 35%, respectively, post completion of the acquisition.

Headquartered in San Diego, Entropic is recognized for pioneering the MoCA® (Multimedia over Coax Alliance) home networking standard, inventing Direct Broadcast Satellite ("DBS") outdoor unit single-wire technology, and developing the industry's first set-top box SoC platform based on the ARM® processor with advanced OpenGL graphics. Entropic has a rich history of innovation and deep expertise in RF, analog/mixed signal and digital signal processing technologies.

Entropic's silicon solutions have been broadly deployed across major cable, satellite, and fiber service providers.

The acquisition will add significant scale to MaxLinear's analog/mixed-signal business, expanding its addressable market and enhancing the strategic value of MaxLinear's offerings to its broadband and access partners, OEM customers, and service providers. MaxLinear sees immediate cross-selling opportunities and longer-term platform integration opportunities with Entropic's leading MoCA technology.

Along with broadening MaxLinear's presence in its existing markets, Entropic adds immediate scale and deep customer relationships in MaxLinear's most recent growth area of the satellite Pay-TV market. Entropic's design talents and portfolio of approximately 1,500 issued and pending patents are highly complementary, and MaxLinear is uniquely positioned to capitalize on these assets.

"We are very excited about the opportunity to bring together two talented and largely complementary teams, as we increase our capabilities to solve the most difficult analog and mixed-signal RF challenges in Broadband markets," said Dr. Kishore Seendripu, CEO of MaxLinear. "We believe the scale and strategic benefits of a broader technology portfolio will enable us to accelerate our expansion into new markets more effectively. The financial benefits of the transaction should be immediately visible, as we expect non-GAAP earnings accretion in the first full quarter post-close."

Dr. Ted Tewksbury, Interim President and CEO of Entropic, commented, "I share Kishore's enthusiasm for this combination, which we believe maximizes value for Entropic's shareholders, employees and customers. These are two excellent companies in the industry, and I believe our stakeholders will benefit from the resources and scale that the combination will provide."

**Other Transaction and Financial Details**

As a result of the combination, MaxLinear anticipates it will achieve operating synergies in excess of $20 million in the first full calendar year post-close. Increased scale and projected cost savings are expected to lower combined non-GAAP operating expenses, generate significant operating margin expansion, and accelerate MaxLinear's timing to achieving its stated target operating model.

The transaction is expected to close in the second quarter of 2015 subject to approval by the shareholders of both companies, the receipt of regulatory approvals, and other customary closing conditions. MaxLinear will add Dr. Ted Tewksbury to its board of directors upon closing of the transaction.

Stifel is acting as exclusive financial advisor to MaxLinear. Barclays is acting as exclusive financial advisor to Entropic. Wilson Sonsini Goodrich & Rosati, P.C. is acting as counsel for MaxLinear and Cooley LLP is acting as counsel for Entropic.

**The Errors Underlying Barclays' Financial Analysis and Fairness Opinion Are Revealed**

60.   After the Merger Agreement was announced, Entropic and MaxLinear became aware that the financial projections relied upon, and used by Barclays and MaxLinear's financial advisor, Stifel, Nicolaus & Company, Inc. ("Stifel"), in their financial analyses, contained significant errors relating to the calculation of MaxLinear's unlevered free cash flows.  Because of these errors, Barclays assigned a higher value to MaxLinear's discounted cash flows, which meant that it placed a higher, more favorable valuation on MaxLinear's stock price.  This is important because, under Barclays' analyses, the stock component of the Merger Consideration was valued higher than what it was actually worth, *i.e.*, Entropic shares would be converted to higher value shares of MaxLinear.  Accordingly, based on its flawed financial analyses, Barclays opined that the Merger Consideration offered by MaxLinear was fair to Entropic's shareholders.  The Board subsequently relied on Barclays' fairness opinion in approving the Merger Agreement.

61.   Only after the Board approved the deal was it revealed that Barclays had erroneously overstated MaxLinear's cash flows. Thereafter, Barclays conducted a new discounted cash flow analysis, this time using the corrected numbers, which indicated an implied range of value per share of MaxLinear Class A common stock of ***$9.30 to $17.52***, which was considerably lower than the range of values that Barclays originally presented to the Board of ***$10.12 to $19.30***.  This meant that the stock portion of the Merger Consideration was worth significantly less to Entropic's shareholders than what Barclays' financial analyses had originally shown.  Yet, when confronted with this glaring errors, the Board raised "no concerns or objections regarding [Barclays'] revised analyses" and continued to support the Merger Agreement.

**The Proposed Acquisition Is Unfair**

62.   As discussed above, the Proposed Acquisition was the product of a hopelessly flawed sales process.  Entropic's Board and management directed the

process in a manner that overwhelmingly favored MaxLinear, at the expense of another interested party, Company A.   From the outset, the Board devoted its exclusive attention to pursuing a deal with its favored partner, MaxLinear, and actively took steps to thwart a competing proposal from Company A.   The Board's demand that Company A agree to a certain threshold price, as well as certain restrictive merger terms, all within a "24-36 hour" period was particularly egregious and unfair, given that Company A had already submitted two proposals to acquire Entropic, both of which offered more consideration to the Company's shareholders on an all-cash basis than MaxLinear's proposal.

63.   Of course, the Board did not require MaxLinear to adhere to any of the onerous terms that it sought to extract from Company A.   Instead, the Board accommodated MaxLinear at every turn and provided MaxLinear full access to Entropic's senior management and data room, so that MaxLinear could adequately conduct its due diligence.   The Board refused to provide the same access to Company A.

64.   Moreover, once the Board discontinued discussions with Company A and went exclusive with MaxLinear (despite its lower value offer), Company A was effectively barred from further pursuing an acquisition of Entropic, due to the existence of the standstill agreement mandated by the Board.   Rather than waive the standstill agreements once the deal was announced with MaxLinear, the Board signed off on an anti-waiver provision in the Merger Agreement that locked in the standstill agreement, which further thwarted the possibility of a value-maximizing proposal from Company A.

65.   Additionally, as part of the Merger Agreement, the Board agreed to implement other preclusive deal protection devices to ensure that the sale of the Company to MaxLinear is quickly consummated and any subsequent bids are negated. First, the Merger Agreement contains a No-Solicitation provision that prevents Entropic from seeking a better deal for the Company's public stockholders, or even

1  engaging in discussions that could lead to a competing proposal.  Under this onerous

2  provision, Entropic is prohibited from directly or indirectly taking the following

3  actions, *inter alia*:

4             (a)     soliciting, initiating, inducing or encouraging the making,

5  submission or announcement of any inquiry, proposal, offer, indication of interest or

6  transaction that constitutes or could reasonably be expected to lead to, an Acquisition

7  Proposal or Acquisition Transaction;

8             (b)     furnishing any non-public information to any other party in a

9  manner intended to assist or facilitate any inquiry, proposal, offer, indication of

10  interest or transaction that constitutes or could reasonably be expected to lead to, an

11  Acquisition Proposal or Acquisition Transaction;

12             (c)     participate or engage in discussions or negotiations with any other

13  party with respect to any inquiry, proposal, offer, indication of interest or transaction

14  that constitutes or could reasonably be expected to lead to, an Acquisition Proposal or

15  Acquisition Transaction; and

16             (d)     approving, endorsing, or recommending an Acquisition Proposal

17  or Acquisition Transaction.

18         66.     While the No-Solicitation provision makes it next to impossible for

19  another party to pursue an acquisition of Entropic, even if an interested party were to

20  submit an unsolicited competing proposal for the Company, the Board has no

21  obligation to submit the proposal to the vote of the stockholders, unless the Board, in

22  its sole discretion, determines it to be a "Superior Proposal," which is narrowly

23  defined to include acquisitions of at least **50.1%** of Entropic's total assets.  This

24  eliminates the possibility of a sale of Entropic in parts, even though it could be value-

25  maximizing.

26         67.     The Board has further agreed to a broad Matching Rights provision that

27  gives MaxLinear substantial procedural advantages over any subsequent competing

28  bidder.  Entropic has agreed to promptly advise MaxLinear, orally and in writing,

within 24 hours, of: (i) any Acquisition Proposal it receives; (ii) any request for information it receives that could reasonably be expected to lead to an Acquisition Proposal or an Acquisition Transaction; or (iii) any inquiry it receives with respect to, or which could reasonably be expected to lead to, any Acquisition Proposal or Acquisition, including a summary of the material terms and conditions of such Acquisition Proposal, Acquisition Transaction, request or inquiry, and the identity of the Person or group making any such Acquisition Proposal, request or inquiry. Moreover, Entropic must keep MaxLinear reasonably and promptly informed of the status and details of any competing proposal.  And, if the Board finds that an acquisition proposal is a "Superior Proposal," Entropic must provide MaxLinear five business days to revise its proposal.  This grace period to "match" any offer gives MaxLinear a known and substantial edge in any bidding war, and as a result operates to discourage any other bids from being made.

68.     The Board further reduced the likelihood of obtaining a superior offer or the best possible price for the Company's public stockholders by agreeing to a substantial termination fee.  The Merger Agreement provides that, upon termination of the Merger Agreement, the Company will be required to pay MaxLinear a termination fee of $11,650,000, in addition to expenses incurred by MaxLinear.

69.     All of these unduly restrictive deal protection devices, coupled with the standstill and anti-waiver provisions, in combination with one another, act to restrain the Company's ability to solicit or engage in negotiations with any third-party regarding a proposal to acquire all or a significant interest in the Company.  The inclusion of these provisions in the Merger Agreement does not provide the Board an effective "fiduciary out" under the circumstances.  These provisions foreclose any realistic chance that any potential bidders will express interest or make alternative bids in order to provide the needed market check on MaxLinear' inadequate offer.

70.     So why did the Board agree to such a bad deal?  The Board and the Company's senior management approved the Proposed Acquisition for self-interested

reasons unrelated to the merits of the transaction.  The Company insiders certainly had personal reasons to favor MaxLinear over Company A, a financial investor based in China. The management of Entropic and MaxLinear were very familiar with one another, as both were based in San Diego, and they had engaged in numerous discussions in the past about a potential combination.  Moreover, certain directors on the boards of the two companies had longstanding ties, particularly Tewksbury, Padval and MaxLinear director Schrock, all of whom served on the board or were officers of IDT. However, the Board intentionally overlooked this conflict of interest and authorized Tewksbury and Padval to take lead roles in the sales process.  The Board could have, but failed to, set up a truly independent special committee to direct the process.

71.    Additionally, the Company's officers and directors were heavily inclined to do a deal with MaxLinear because of the special benefits they would receive once the deal was consummated – ***special benefits that were not otherwise offered or provided to Entropic's public stockholders***.   Indeed, for their acquiescence, Entropic's officers and directors (aside from Tewksbury, see below) will receive millions of dollars in stock consideration for their currently held unvested stock options and restricted stock units, all of which will become fully vested and exercisable upon closing.  The accelerated vesting of these holdings would not have occurred had Entropic remained a standalone company.  Furthermore, ordinary stockholders were not granted this lucrative financial benefit, as the Merger Agreement specifically provides that the holdings of stockholders who are not officers or directors of the Company will not be subject to accelerated vesting.

72.    The Company's senior management will also receive millions of dollars in additional change-in-control payments that are not available to the ordinary stockholders.  Furthermore, Tewksbury, Entropic's current interim CEO, President and Board member, was handsomely rewarded with an appointment to MaxLinear's board and will receive additional cash and equity compensation for this appointment once the deal closes.  Because Tewksbury will continue his employment as a

1  MaxLinear board member, any Entropic stock options or restricted stock units held by
2  him will be assumed by MaxLinear.

3      73.    The personal benefits that were secured by the members of Entropic's
4  Board and management were key factors in the Individual Defendants' decision to
5  pursue the Proposed Acquisition with MaxLinear.  Instead of attempting to negotiate
6  an agreement reflecting the best consideration reasonably available for the Entropic
7  shareholders they are duty-bound to serve, the Individual Defendants disloyally placed
8  their own interests first, and tailored the terms and conditions of the Proposed
9  Acquisition to meet their own needs and objectives.  The Board's efforts to advance
10  its members' personal interests at the expense of Company shareholders has resulted
11  in the inadequate Proposed Acquisition being presented to the shareholders at an
12  unfair and suboptimal price.

13      74.    Other conflicts of interest pervaded the process.  Barclays' longstanding
14  and profitable relationship with Entropic compromised its ability to render unbiased
15  advice to its purported client.  Barclays had been previously engaged by Entropic in a
16  variety of capacities in the past and did not want disrupt the pipeline in fees it had
17  been receiving through the years from these engagements.   Moreover, as
18  compensation for its services in connection with the Proposed Acquisition, Entropic
19  agreed to pay Barclays a contingency fee of *$5,100,000* – $500,000 of which was
20  payable upon the delivery of Barclays' fairness opinion, with the vast remainder to
21  become payable upon the closing of the deal.  Incentivized to advance its relationships
22  with Entropic, and to secure its contingency fee, Barclays manipulated its financial
23  analyses to make the Proposed Acquisition consideration appear fair to the
24  Company's stockholders, when it was not.

25  **The Proposed Acquisition Fails to Maximize Shareholder Value**

26      75.    In spite of their duty to do so, the members of Entropic's Board failed to
27  secure the best value reasonably available for the Company's stockholders in
28  connection with the Proposed Acquisition.  Under the Merger Agreement, Entropic's

shareholders are set to receive Merger Consideration valued at a mere $3.01 per Entropic share (as of the date of the announcement), comprised of the following cash and stock components: (i) $1.20 in cash for each share of Entropic common stock held; and (ii) a fractional interest of 0.2200 of a share of MaxLinear Class A common stock for each share of Entropic common stock held.  As a threshold matter, the agreed-upon Merger Consideration is considerably less than what Company A was willing to offer for Entropic.  The ***low-end*** of the range of Company A's January 12, 2015 proposal has an implied value of $3.33 per share – $0.32 more than the final consideration offered by MaxLinear.

76.    Moreover, the Merger Consideration substantially undervalues Entropic by failing to account for, among other things, the Company's robust growth prospects and the substantial synergies that will result from the consummation of the Proposed Acquisition.   The Company's extensive product development efforts, which management had touted in early 2014, was beginning to bear fruit and, in fact, served to bolster the Company's revenues ***right around the time the Proposed Acquisition was announced.***   Indeed, on February 3, 2015, during the same conference call announcing the Proposed Acquisition with MaxLinear, defendant Tewksbury reported a significant increase in the Company's revenues "from $42.6 million in Q4 [2014] to $45 million to $46 million in the first quarter [2015]," which was largely "driven by growth in SoCs and HD DTAs, which are showing a great deal of strength, and also MoCA and SoCs in IP set-top boxes, specifically the DIRECTV Genie client which started shipping in Q1 . . . [a]nd then, also MoCA in adapters, such as wireless Ethernet-to-coax adapters."  The Merger Consideration therefore does not adequately reflect the Company's product development achievements and  its significant long-term earnings potential.

77.    Due to Entropic's strong growth prospects, professional investment analysts that covered the stock valued the Company significantly higher than the Merger Consideration of $3.01 per share offered by MaxLinear.   In the period

1    preceding the announcement of the Proposed Acquisition, the median analyst price

2    target for the Company stock was $3.81 per share, with at least one analyst valuing the

3    stock at $5.00 per share.  Moreover, Entropic shares had traded above the value of the

4    Proposed Acquisition consideration for five years prior to July 2014.

5        78.    Given the market's robust valuation of the Company, at least one analyst

6    was surprised by the marginal price offered by MaxLinear.  An analyst from Craig-

7    Hallum issued a report the day after the announcement, noting:

8        Not the payday ENTR investors were hoping for.  On Sept. 16, 2014 the
         Company announced it had retained Barclays to explore and evaluate
9        strategic alternatives.  We believe investors will be disappointed that
         over the last 5 months since this announcement, a deal with MXL at a
10       small premium was the best they could come up with given ENTR's vast
         MoCA patent position.  It seems to us, that MXL is getting a sweet deal
11       in the purchase price.

12       79.    Furthermore, the Merger Consideration fails to adequately compensate

13   Entropic shareholders for the significant synergies that MaxLinear will enjoy upon the

14   completion of the Proposed Acquisition.  MaxLinear is expected to reap ***tens of***

15   ***millions of dollars*** in synergistic benefits***, annually***, once the deal is completed.  In

16   the press release announcing the deal, MaxLinear's CEO, Kishore Seendripu,

17   highlighted the strategic and financial benefits that would result from the addition of

18   Entropic's expansive technology portfolio:

19       "We are very excited about the opportunity to bring together two
         talented and largely complementary teams, as we increase our
20       capabilities to solve the most difficult analog and mixed-signal RF
         challenges in Broadband markets," said Dr. Kishore Seendripu, CEO of
21       MaxLinear. "We believe the scale and strategic benefits of a broader
         technology portfolio will enable us to accelerate our expansion into new
22       markets more effectively. The financial benefits of the transaction should
         be immediately visible, as we expect non-GAAP earnings accretion in
23       the first full quarter post-close."

24       80.    Seendripu also touted the considerable cost-savings that MaxLinear was

25   set to achieve through the Proposed Acquisition, during the conference call discussing

26   the announcement of the deal:

27       ***[W]e estimate at least $20 million in realizable synergies in the first full***
         ***calendar year after closing.*** On the sales side there is considerable
28       overlap in our customer base.  We have 3 common top 10 customers,

which in 2014 accounted for roughly 43% of MaxLinear's total revenue and 27% of Entropic's revenue. We have several offices in common locations that can be unified along with corporate overhead functions including duplicative public company costs. As such, we expect the acquisition to be immediately accretive to MaxLinear's non-GAAP earnings after closing.

81.     Under the Merger Agreement, the Company's public stockholders are set to receive a marginal, fractional interest in MaxLinear for each Entropic share owned. The proposed Merger Consideration therefore does not adequately reflect the value of these post-combination synergies to Entropic and its stockholders.

82.     The Merger Consideration is also unfair and inadequate because Entropic stockholders will have little, if any, corporate governance rights, once the Proposed Acquisition closes and their shares are exchanged for a fractional interest in MaxLinear. MaxLinear has a dual class stock structure under which its founders, management, directors and employees own shares of MaxLinear Class B common stock, ***which is not publicly traded***. Holders of MaxLinear Class B common stock are therefore entitled to special governance rights including: (i) the ***sole*** right to elect two management directors to the board; and (ii) with respect to matters concerning change of control and management equity incentive plans, Class B stockholders have ***ten votes*** per share compared to the holders of MaxLinear Class A common stock who only have one vote per share. Because of their holdings in shares of Class B stock, the founders and management of MaxLinear have a dominant voting block, with around 61% of the voting power of MaxLinear's outstanding capital stock. By contrast, Entropic stockholders are set to receive a marginal interest of 0.2200 of a share of MaxLinear Class A common stock for each Entropic share held, which gives them little say in MaxLinear's corporate decision-making.

83.     Finally, to make matters even worse, the Board failed to obtain a protective collar on the stock portion of the Merger Consideration. A collar provision in the Merger Agreement would protect Entropic stockholders from a dwindling of the value of the deal in the event of a decline the market price of MaxLinear common

stock.  A collar would prevent this from occurring by increasing the number of shares that Entropic stockholders would receive for their stock when MaxLinear's share price declines.

84.     The price of MaxLinear common stock has in fact declined since the announcement of the Proposed Acquisition, causing the value of the deal to decline even further.  The Merger Consideration was initially valued at $3.01 per share, based on the $8.24 closing price of MaxLinear, Inc. common stock on February 2, 2015, the day before the deal was announced.  Since then, MaxLinear's stock price has steadily declined to $7.93 per share, as of March 26, 2015, causing the value of the Merger Consideration to Entropic shareholders to drop to approximately *$2.94* per share of Entropic common stock.  Clearly, the Board's failure to obtain a collar has left Entropic stockholders vulnerable to these stock declines.

85.     Based on the foregoing, it is clear that the Merger Consideration provided under the Merger Agreement does not reflect the true inherent value of the Company, as known only to defendants at the time the Proposed Acquisition.

### THE MATERIALLY FALSE AND/OR MISLEADING PROXY STATEMENT

86.     In connection with the upcoming shareholder vote on the Proposed Acquisition, defendants filed and disseminated a materially false and/or misleading S-4, in contravention of §§14(a) and 20(a) of the 1934 Act, and/or defendants' duty of candor and full disclosure under state law.  The S-4, which recommends that Entropic shareholders vote in favor of the Proposed Acquisition, misrepresents and fails to disclose material information necessary for the Company's public stockholders to make an informed decision as to whether to vote their shares in favor of the Proposed Acquisition of Entropic by MaxLinear.

87.     The S-4 was false and/or misleading in that it omitted and/or misrepresented true facts which were then known by, or available to the defendants. First, the S-4 states that the Board "determined that the terms of the merger agreement

were advisable and fair to, and in the best interests of, Entropic and its stockholders." The S-4 further states that the Board authorized the Merger Agreement and recommended that it be approved by the Company's shareholders based on certain factors including: "The Entropic board of directors' belief that it had conducted a thorough review of strategic alternatives after making a public announcement of its review in September 2014, that there was a low likelihood that a competitive proposal would emerge, and that other third parties would not likely provide the same comparable strategic upside as a combination with MaxLinear." These statements were false and/or misleading because the Board knew at the time that Company A had in fact made two "competitive proposals" to acquire Entropic, both of which offered more consideration to the Company's stockholders than what MaxLinear had offered. The Board was plainly aware at the time those statements were made that the Merger Consideration offered under the Merger Agreement was not fair and not in the best interests of Entropic and its shareholders.

88.   In fact, to obfuscate the value of the proposals made by Company A, defendants intentionally did not disclose in the S-4 the per share price range that Company A was willing to offer for Entropic.  Had they made such a disclosure, Entropic's public shareholders would have been able to ascertain that Company A was willing to acquire Entropic at a price range that was considerably higher than what MaxLinear was offering.

89.   The S-4 also omitted and/or misrepresented material information about the flawed sales process and the conflicts of interests that burdened the process, including the following:

(a)   the basis for the Board's selection of, and the process by which the Board identified and selected parties who might have been interested in pursuing a strategic transaction with the Company;

(b)   the details concerning the Board's consideration of other potential strategic alternatives, including continuing as a stand-alone, independent company;

1    (c)  the basis for the Board's decision to appoint defendants Tewksbury

2 and Padval to the Strategic Committee, and its subsequent appointment of Padval to

3 the Executive Committee, for the purpose of overseeing and directing the sales

4 process;

5    (d)  the details concerning: (i) defendants Tewksbury's and Padval's

6 past and/or present employment at IDT; (ii) their relationship, affiliation, and/or ties to

7 MaxLinear board member Schrock, who was also employed at IDT; and (iii) whether

8 the Board considered Tewksbury's and Padval's relationship, affiliation, and/or ties

9 with Schrock in allowing them to oversee and direct the sales process;

10    (e)  the basis for the Board's decision on January 11, 2015 to suspend

11 discussions with Company A and enter into an exclusivity agreement with MaxLinear;

12    (f)  the basis for the Board's decision on January 19, 2015 to impose

13 certain requirements on Company A as a prerequisite to continuing discussions with

14 Entropic, including: (i) payment of a cash purchase price of $4.00 per share of

15 Entropic common stock; (ii) the signing of a definitive agreement before February 19,

16 2015; (iii) no exclusivity period; (iv) the payment of a reverse break-up fee of

17 $50 million, to be immediately deposited with an escrow agent, which would be

18 disbursed to Entropic if the transaction was terminated due to Company A's inability

19 to secure the necessary foreign investment approval;

20    (g)  the basis for the Board's demand that Company A pay a cash

21 purchase price of $4.00 per share;

22    (h)  the basis for the Board's decision to deny Company A the ability to

23 conduct due diligence;

24    (i)  the basis for the Board's decision to enter into an exclusivity

25 agreement with MaxLinear on January 21, 2015;

26    (j)  whether the Board considered including a protective collar as part

27 of the consideration in the Merger Agreement in order to protect Entropic

28 shareholders from declines in Entropic's stock price;

(k)     the details and contents of any confidentiality, non-disclosure agreements, and/or standstill agreements and the basis for the Board's use of such agreements;

(l)     the basis for the Board's selection of, and the process by which the Board selected and retained Barclays as its financial advisor on the Proposed Acquisition;

(m)    the details surrounding Barclays' prior engagements by Entropic and any of its affiliates, and the fees paid to Barclays pursuant to all such engagements; and

(n)    the details surrounding Barclays' prior engagements by MaxLinear, and the fees paid to Barclays pursuant to all such engagements.

90.     The failure to disclose the foregoing information renders the S-4 false and materially misleading in that it gives Entropic shareholders an incomplete and distorted picture of the sales process and leaves the shareholders unable to determine whether the Board took all steps necessary to maximize shareholder value.

91.     In order for the public stockholders to make an informed decision about whether to vote for the Proposed Acquisition, defendants were required to disclose even ***potential*** conflicts of interest.  The stockholders are therefore entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the stockholders' interest in maximized value.  Defendants here failed to disclose material information concerning actual and potential conflicts that burdened the sales process.

92.     The S-4 also omitted and/or misrepresented material information about the intrinsic value of the Company, which makes it more likely that Entropic's public shareholders will be coerced and misled into voting in favor of the Proposed Acquisition without that material information regarding the critical decision they face.

93.     Specifically, defendants made material misleading statements or otherwise failed to disclose material information in the S-4 concerning Barclays' financial analyses and fairness opinion, including the following:

(a)     the benchmarking and comparative metrics used by Barclays to compare Entropic to other selected public companies in its *Comparable Company Analysis.*  In particular, the S-4 fails to disclose: (i) the 2014 and 2015 EV/ revenue multiples for each of the selected companies; (ii) the 2015 and 2016 EV/ EBITDA multiples for each of the selected companies; and (iii) the "growth prospects and profitability levels," as well as any other observed benchmarking metrics, for each of the selected public companies.  Without this material information, shareholders do not have the ability to understand how Barclays arrived at the reference ranges implied by the analysis, and thus are unable to adequately assess how Entropic compares to other companies in its space based on the analysis;

(b)     the implied terminal EV/revenue and/or EV/EBITDA multiple ranges derived from Barclays' *Discounted Cash Flow Analysis* for Entropic.  Without this material information, shareholders cannot assess the actual intrinsic value of their shares in Entropic, and thus cannot make a fully informed decision whether to vote in favor of the Proposed Acquisition;

(c)     the benchmarking and comparative metrics used by Barclays to compare MaxLinear to other selected public companies in the *Comparable Company Analysis.*  In particular, the S-4 fails to disclose: (i) the 2014 and 2015 EV/revenue for each of the selected companies; (ii) the 2014 - 2016 EV/ EBITDA for reach of the selected companies; (iii) the 2014 and 2015 P/E ratio for each of the selected companies; and (iv) the "growth prospects" and "profitability levels," as well as any other observed benchmarking metrics, for each of the selected public companies. Without this material information, shareholders do not have the ability to understand how Barclays arrived at the reference ranges implied by the analysis, and thus cannot

1   adequately assess how MaxLinear compares to similar companies in its space based
2   on the analysis;

3            (d)     the individual inputs and assumptions Barclays used in its
4   Discounted Cash Flow Analysis for MaxLinear.  In particular, the S-4 fails to
5   disclose: (i) the implied terminal EV/revenue; (ii) and/or EV/EBITDA multiple
6   ranges, used by Barclays to derive the discount rate.  Without this material
7   information, shareholders cannot assess the actual intrinsic value of their shares in
8   Entropic, and thus cannot make a fully informed decision whether to vote in favor of
9   the Proposed Acquisition;

10           (e)     the corrected 2015-2017 EBITDA forecast that Barclays applied in
11  its Discounted Cash Flow Analysis for MaxLinear.  The S-4 provides that after
12  Barclays delivered its fairness opinion and the Board approved of the Merger
13  Agreement, certain "errors" were discovered in the financial projections used and
14  relied upon by Barclays.  The S-4 further provides that Barclays performed a
15  Discounted Cash Flow Analysis for MaxLinear using "corrected" financial
16  projections, but does not disclose the corrected 2015 – 2017 EBITDA forecast for
17  MaxLinear that Barclays used in the analysis.  Without this material information,
18  shareholders cannot assess the actual intrinsic value of their shares in Entropic, as
19  compared to the actual value of the shares of MaxLinear they are set to receive under
20  the Proposed Acquisition, and thus cannot make a fully informed decision whether to
21  vote in favor of the Proposed Acquisition; and

22           (f)     Barclays' use of premium/discount multiples in its financial
23  analyses.  In particular, Barclays applied a 20% premium and 20% discount in its
24  financial analyses, including for its Comparable Company Analysis, Discounted Cash
25  Flow Analysis, and Precedent Transaction Analysis, but fails to explain why this
26  premium/discount multiple was applied and why 20% is a reasonable or appropriate
27  premium/discount multiple.  Without this material information, shareholders cannot
28  assess the actual intrinsic value of their shares in Entropic, as compared to the actual

1     value of the shares of MaxLinear they are set to receive under the Proposed

2     Acquisition, and thus cannot make a fully informed decision whether to vote in favor

3     of the Proposed Acquisition.

4        94.     Defendants also made material misleading statements or otherwise failed

5     to disclose material information in the S-4 concerning Stifel's (MaxLinear's financial

6     advisor) financial analyses and fairness opinion, including the following:

7        (a)     whether the equity value per share indications developed by Stifel

8     are based on the corrected or non-corrected MaxLinear financial projections;

9        (b)     the benchmarking and comparative metrics used by Stifel to

10     compare MaxLinear and Entropic to other selected public companies in its *Selected*

11     *Public Companies Analysis*. In particular, the S-4 fails to disclose: (i) the 2014 and

12     2015 EV/revenue for each of the selected companies; (ii) the 2014 - 2015 EV/

13     EBITDA for reach of the selected companies; and (iii) the "size, growth, and

14     profitability" benchmarking metrics, as well as any other benchmarking metrics

15     observed, for each of the selected public companies analyzed by Stifel. Without this

16     material information, shareholders do not have the ability to understand how Stifel

17     arrived at the reference ranges implied by the analysis, and thus how MaxLinear and

18     Entropic compare to similar companies in their respective spaces based on the

19     analysis;

20        (c)     the benchmarking and comparative metrics used by Stifel to

21     compare the Proposed Acquisition to other selected transactions in its *Selected*

22     *Transactions Analysis*. In particular, the S-4 fails to disclose the LTM and NTM EV/

23     EBITDA multiples for each of the selected transactions analyzed by Stifel. Without

24     this material information, shareholders do not have the ability to understand how

25     Stifel arrived at the reference ranges implied by the analysis, and thus cannot

26     adequately assess how the Proposed Acquisition compares to purportedly "similar"

27     transactions based on the analysis;

28

(d)     the individual inputs and assumptions Stifel used in its *Discounted Cash Flow Analysis* for Entropic.  In particular, the S-4 fails to disclose: (i) the implied perpetuity growth rate ranges resulting from both the first case and second case analyses; and (ii) the terminal EBITDA metric, after synergies, utilized by Stifel to develop the terminal value in the second case discounted cash flow analysis; and

(e)     the individual inputs and assumptions Stifel used in its *Discounted Cash Flow Analyses* for MaxLinear.  In particular, the S-4 fails to disclose: (i) the implied perpetuity growth rate ranges resulting from both the first case and second case discounted cash flow analyses; and (ii) the corrected 2015 – 2017 EBITDA forecast for MaxLinear utilized by Stifel in this analysis.

95.     Defendants also made material misleading statements or otherwise failed to disclose material information concerning the financial projections for Entropic for years 2015 through 2019, which were prepared by Entropic management and relied upon by Barclays and Stifel for purposes of their respective financial analyses.  In particular, the S-4 omits the following line items relating to those financial projections: (i) connectivity solutions revenue; (ii) STB SoC solutions revenue; (iii) connectivity solutions-related expenses; and (iv) STB SoC solutions-related expenses.  Without this material financial information, shareholders cannot conduct their own accurate assessment of Entropic's value based on the financial projections provided by the Company's management.  These omissions render the information concerning the financial projections set forth on pages 116-117 of the S-4 materially misleading.

96.     Finally, while the S-4 states that Barclays was provided with "five potential projected revenue and profit and loss scenarios prepared by management," defendants fail to disclose: (i) the details of those financial scenarios; (ii) whether and how any of those scenarios were incorporated in the Company's financial projections as set forth in the S-4; and (iii) whether and how Barclays utilized any of those scenarios in its financial analyses and fairness opinion.  Without this material

1  information, shareholders do not have the ability to understand how Barclays arrived

2  at the range of values that resulted from its analyses and cannot conduct their own

3  accurate assessment of Entropic's value.

4      97.  There is no more material information to shareholders in a corporate

5  acquisition than the information underlying or supporting the purported "fair value" of

6  their shares.  Shareholders are entitled to the information necessary to inform a

7  decision as to the adequacy of the merger consideration, which includes the

8  ***underlying data*** (including management's projections) the investment bankers relied

9  upon, the ***key assumptions*** that the financial advisors used in performing valuation

10  analyses, and the range of values that resulted from those analyses.  Here the analyses

11  of both Entropic's and MaxLinear's financial advisors incorporated certain critical

12  assumptions that significantly affect the output (valuation) of the analyses.  Without

13  this material information, shareholders have no basis on which to judge the adequacy

14  of the Proposed Acquisition.

15      98.  Without full and fair disclosure of the material information set forth

16  above, Entropic's shareholders should not be asked to vote to approve the Proposed

17  Acquisition.  Plaintiffs therefore seek to enjoin the Proposed Acquisition.

18                   **DEFENDANTS' FIDUCIARY DUTIES**

19      99.  Because of their positions of control and authority as directors and/or

20  officers of the Company, the Individual Defendants were able to and did directly

21  and/or indirectly, participate in, authorize or acquiesce in the wrongful acts

22  complained of herein.

23      100.  To discharge their duties, the officers and directors of the Company were

24  required to exercise reasonable and prudent supervision over the management,

25  policies, practices and controls of the Company.  By virtue of such duties, the officers

26  and directors of the Company were required to, among other things:

27

28

(a)     ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of their business;

(b)     ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including complying with rules and regulations issued by the SEC, state regulatory agencies and state and federal courts before which the Company appears as a party;

(c)     exercise good faith in ensuring that the Company had adequate internal controls such that it is capable of complying with federal law to report all material information to shareholders in the Company's filings with the SEC before shareholder approval of corporate action, and that the Company was actually complying with such laws;

(d)     exercise good faith in supervising the preparation and filing of all reports required by law, including reports filed with the SEC, and in examining and evaluating such reports and other information concerning the affairs of the Company; and

(e)     exercise good faith in remaining informed regarding the affairs of the Company, including, but not limited to, the Company's compliance with federal law pertaining to its obligations to shareholders, and, upon receipt of notice or information regarding imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith and take steps to correct such conditions or practices.

101.   In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either (i) a change in corporate control, or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the

shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     discourages or inhibits alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     otherwise adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders;

(e)     fails to undertake an appropriate evaluation of the Company's worth as an acquisition candidate or in liquidation;

(f)     fails to fully and completely disclose all material information during consideration of a proposed acquisition; and/or

(g)     provides the directors with preferential treatment at the expense of, or separate from, the public shareholders.

102.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Entropic, were obligated to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties were divided;

(b)     participating in any transaction where the directors or officers received a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

103.    Plaintiffs allege herein that defendants, separately and together, in connection with the Proposed Acquisition, breached and/or aided and abetted in the breach of fiduciary duties owed to plaintiffs and the other public shareholders of

1   Entropic, including the duties of loyalty, good faith, candor, due care and

2   independence.  As a result of these breaches of fiduciary duties and the aiding and

3   abetting therein, neither plaintiffs nor the Class received adequate or fair value for

4   their Entropic common stock in the Proposed Acquisition.

5   104.   Plaintiffs allege herein that the Individual Defendants, aided and abetted

6   by Entropic and MaxLinear, knowingly or recklessly violated their fiduciary duties,

7   including their duties of loyalty, due care, good faith, fair dealing, independence and

8   candor owed to the Company and its public shareholders in connection with the

9   Proposed Acquisition.  The Individual Defendants, aided and abetted by Entropic and

10  MaxLinear, engaged in self-dealing, and have negotiated for themselves personal

11  benefits, including personal financial benefits and indemnification benefits not shared

12  by plaintiffs or the Class, or have aided and abetted others who did so.  As a result of

13  the Individual Defendants' self-dealing and divided loyalties, among other things, the

14  negotiation process for the Proposed Acquisition was tainted and unfair.  The

15  members of the Class were not provided with a fair process or a fair price for their

16  Entropic common stock in the Proposed Acquisition.

17  105.   The Individual Defendants also owe the Company and its stockholders a

18  duty of truthfulness under California law, which includes the disclosure of all material

19  facts concerning the Proposed Acquisition.  The Individual Defendants, aided and

20  abetted by Entropic and MaxLinear, knowingly or recklessly breached their fiduciary

21  duties of candor and good faith by failing to disclose all material information

22  concerning the Proposed Acquisition, the true value of the Company and the conflicts

23  of the Individual Defendants.

24  106.   Because the Individual Defendants, aided and abetted by Entropic and

25  MaxLinear, knowingly or recklessly breached their duties of loyalty, good faith, fair

26  dealing, independence and candor in connection with the Merger and/or aided and

27  abetted others who did so, the burden of proving the inherent or entire fairness of the

28  Proposed Acquisition (including all aspects of its negotiation, structure, price and

1   terms) is placed upon the Individual Defendants as a matter of law.  The Individual

2   Defendants cannot meet that burden.

3       107.   In sum, and as described in further detail herein, by agreeing to the

4   Merger, each of the defendants breached their fiduciary duties of loyalty, due care,

5   independence, candor, good faith and fair dealing, and/or has aided and abetted such

6   breaches.  Rather than acting in the best interests of the Company's shareholders,

7   defendants spent substantial effort tailoring the structural terms of the Proposed

8   Acquisition to aggrandize their own personal interests and to meet the specific needs

9   of MaxLinear, resulting in unfair and inadequate Merger Consideration for the

10  Company's public shareholders.

11      108.   In essence, the Proposed Acquisition was the product of a flawed process

12  that was designed to ensure the acquisition of Entropic by MaxLinear, on terms

13  preferential to MaxLinear and defendants, and detrimental to plaintiffs and Entropic's

14  shareholders.

15                                **COUNT I**

16                         **Against All Defendants**
                     **for Violations of §14(a) of the 1934 Act**
17              **and SEC Rule 14a-9 Promulgated Thereunder**

18      109.   Plaintiffs repeat and reallege the allegations contained above as if fully

19  set forth herein.

20      110.   SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a)

21  of the Securities Exchange Act of 1934, provides:

22          No solicitation subject to this regulation shall be made by means of any

23          proxy statement, form of proxy, notice of meeting or other

24          communication, written or oral, containing any statement which, at the

25          time and in the light of the circumstances under which it is made, is false

26          or misleading with respect to any material fact, or which omits to state

27          any material fact necessary in order to make the statements therein not

28          false or misleading or necessary to correct any statement in any earlier

communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

111.   Defendants prepared, reviewed and/or disseminated the false and misleading S-4 which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  As stated herein, the S-4 misrepresented and/or omitted material facts, including material information about the unfair consideration offered in the Proposed Acquisition, the actual intrinsic value of the Company, the flawed and unfair sales process orchestrated by defendants and the conflicts of interest that burdened the process.

112.   The omissions and false and misleading statements made by defendants in the S-4 constitute violations of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, because such statements are materially false and/or misleading and were provided in at least a negligent manner.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the S-4, defendants were aware of this information and of their duty to disclose this information in the S-4.

113.   The omissions and false and misleading statements in the S-4 are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the S-4 and in other information reasonably available to shareholders.

114.   By reason of the misconduct detailed herein, the defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

**COUNT II**

**Against the Individual Defendants and MaxLinear**
**for Violation of §20(a) of the 1934 Act**

115.   Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

116.   The Individual Defendants acted as controlling persons of Entropic within the meaning of §20(a) of the 1934 Act.

(a)   By virtue of their positions as officers and/or directors and/or controlling shareholders of Entropic, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the S-4 filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

(b)   Each of the Individual Defendants were provided with or had unlimited access to copies of the S-4 and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

(c)   The S-4 details the Individual Defendants' involvement in negotiating, reviewing and approving the Proposed Acquisition and preparation of the S-4.

(d)   The S-4 contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition. They were thus directly involved in the making of this document.

(e)   By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

117.   MaxLinear is a controlling person of Entropic and the Individual Defendants within the meaning of §20(a) of the 1934 Act.  By reason of its contractual obligations with Entropic and the Individual Defendants, MaxLinear possessed control over Entropic and the Individual Defendants.

(a)   Entropic and the Individual Defendants were required by §§5.2-5.3 of the Merger Agreement to refrain from changing the operation of the Company's business or engaging in a variety of activities without the express written consent of MaxLinear.

(b)   Pursuant to §7.3 of the Proposed Acquisition Agreement, Entropic and MaxLinear were jointly responsible for the preparation of the S-4, and MaxLinear was required to the S-4 with the SEC.

(c)   By reason of such conduct, MaxLinear is liable pursuant to §20(a) of the 1934 Act.

### COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

118.   Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

119.   The Individual Defendants violated the fiduciary duties of care, loyalty, good faith and independence owed to the public shareholders of Entropic and acted to put their personal interests ahead of the interests of Entropic's shareholders.

120.   By the acts, transactions, and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiffs and other members of the Class of the true value inherent in and arising from Entropic.

121.   The Individual Defendants violated their fiduciary duties by entering Entropic into the Proposed Acquisition  without regard to the effect of the Proposed Acquisition on Entropic's shareholders.

122.   As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, and independence owed to the shareholders of Entropic because, among other reasons:

(a)   they failed to take steps to maximize the value of Entropic to its minority shareholders;

(b)   they failed to properly value Entropic and its various assets and operations; and

(c)   they ignored or did not protect against the numerous conflicts of interest resulting from defendants' own interrelationships or connection with the Proposed Acquisition.

123.   Because the Individual Defendants dominate and control the business and corporate affairs of Entropic, and had access to private corporate information concerning Entropic's assets, business and future prospects, there was an imbalance and disparity of knowledge and economic power that existed between them and Entropic's minority shareholders which makes it inherently unfair for the Individual Defendants to pursue and recommend any transaction wherein they will reap disproportionate benefits to the exclusion of maximizing minority shareholder value.

124.   By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiffs and the other members of the Class.

125.   The Individual Defendants engaged in self-dealing, did not act in good faith toward plaintiffs and the other members of the Class, and breached their fiduciary duties to the members of the Class.

126.   As a result of the Individual Defendants' unlawful actions, plaintiffs and the other members of the Class were irreparably harmed in that they did not receive their fair portion of the value of Entropic's assets and operations.

**COUNT IV**

**For Aiding and Abetting Breach of Fiduciary Duty**
**Against Entropic and MaxLinear**

127.   Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

128.   The Individual Defendants owed to plaintiffs and the members of the Class certain fiduciary duties as fully set out herein.

129.   By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiffs and the members of the Class.

130.   Entropic and MaxLinear colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and each was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to plaintiffs and the members of the Class.

131.   Plaintiffs and the members of the Class were irreparably injured as a direct and proximate result of the aforementioned acts.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that the S-4 distributed by defendants to shareholders was materially false and misleading, in violation of Rule 14a-9 and §14(a) of the 1934 Act;

C.      Awarding plaintiffs and the members of the Class compensatory and/or rescissory damages against the defendants;

D.      Awarding plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

1      E.     Awarding extraordinary, equitable and/or injunctive relief as permitted

2 by law, equity and the federal statutory provisions sued hereunder, and any

3 appropriate state law remedies; and

4      F.     Awarding such other relief as this Court may deem just and proper.

5 **JURY DEMAND**

6     Plaintiffs hereby demand a trial by jury on all issues so triable.

7 DATED:  March 30, 2015          ROBBINS GELLER RUDMAN
                                        & DOWD LLP

8                                   DAVID T. WISSBROECKER
                                   EDWARD M. GERGOSIAN

9                                   PHONG L. TRAN

10

11                                      s/ David T. Wissbroecker
                                   DAVID T. WISSBROECKER

12

13                         655 West Broadway, Suite 1900
                       San Diego, CA  92101

14                       Telephone:  619/231-1058
                       619/231-7423 (fax)

15                       LAW OFFICES OF MARC S. HENZEL
                       MARC S. HENZEL

16                       431 Montgomery Avenue, Suite B
                       Merion Station, PA  19066

17                       Telephone:  610/660-8000
                       610/660-8080 (fax)

18                       THE BRISCOE LAW FIRM, PLLC

19                       WILLIE C. BRISCOE
                       8150 N. Central Expressway, Suite 1575

20                       Dallas, TX  75206
                       Telephone:  214/239-4568

21                       281/254-7789 (fax)

22                       POWERS TAYLOR LLP
                       PATRICK W. POWERS

23                       Campbell Centre II
                       8150 North Central Expressway, Suite 1575

24                       Dallas, TX  75206
                       Telephone:  214/239-8900

25                       214/239-8901 (fax)

26                       Attorneys for Plaintiffs

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2  I hereby certify that on March 30, 2015, I authorized the electronic filing of the

3 foregoing with the Clerk of the Court using the CM/ECF system which will send

4 notification of such filing to the e-mail addresses denoted on the attached Electronic

5 Mail Notice List, and I hereby certify that I caused to be mailed the foregoing

6 document or paper via the United States Postal Service to the non-CM/ECF

7 participants indicated on the attached Manual Notice List.

8  I certify under penalty of perjury under the laws of the United States of America

9 that the foregoing is true and correct.  Executed on March 30, 2015.

10            s/ David T. Wissbroecker
               DAVID T. WISSBROECKER

11

12               ROBBINS GELLER RUDMAN
                 & DOWD LLP

13               655 West Broadway, Suite 1900
               San Diego, CA  92101-8498

14               Telephone:  619/231-1058
               619/231-7423 (fax)

15               E-mail:  DWissbroecker@rgrdlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:15-cv-00426-BAS-KSC Badolato v. Maxlinear, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Koji F Fukumura**
  kfukumura@cooley.com,chourani@cooley.com

- **Ignacio E. Salceda**
  isalceda@wsgr.com,bbahns@wsgr.com

- **David T Wissbroecker**
  dwissbroecker@rgrdlaw.com,jaimem@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`